STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-218

HERBERT MARSHALL

VERSUS

COURVELLE TOYOTA

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT 04
PARISH OF ST. LANDRY, NO. 14-00702
ADAM C. JOHNSON, WORKERS' COMPENSATION JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

REVERSED AND RENDERED.

Christopher R. Philipp
P. O. Box 2369
Lafayette, LA 70502-2369
(337) 235-9478
COUNSEL FOR PLAINTIFF/APPELLANT:
    Herbert Marshall

**H. Douglas Hunter**
**Guglielmo, Lopez, Tuttle, Hunter & Jarrell, L.L.P.**
**P. O. Drawer 1329**
**Opelousas, LA 70571-1329**
**(337) 948-8201**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Courvelle Toyota**

**PETERS, J.**

The plaintiff in this workers' compensation case, Herbert Marshall, appeals the judgment of the workers' compensation judge (WCJ) dismissing his claim for benefits against his employer, Courvelle Toyota. For the following reasons, we reverse the WCJ's judgment and render judgment in favor of Mr. Marshall, awarding him benefits, penalties, and attorney fees.

## DISCUSSION OF THE RECORD

The underlying facts giving rise to this litigation are not in dispute. Courvelle Toyota is an automobile dealership located in Opelousas, Louisiana, and on December 27, 2013, Mr. Marshall was employed by the dealership. On that day, his supervisor and Courvelle Toyota's parts manager, Troy Thompson, instructed him to take a truck with a liftgate, pick up a transmission from Ronald's Auto Repair Shop in Opelousas, and deliver the transmission to the dealership. Mr. Thompson considered the lift-gate truck to be necessary because the transmission weighed approximately four hundred pounds. Instead of taking the lift-gate truck, Mr. Marshall took a standard van for the pickup and delivery. When he arrived at Ronald's Auto Repair, he enlisted the aid of Ronald Robin, Jr.[1] in picking up the transmission by hand and loading it into the van. Mr. Marshall claims to have felt a "pop" in his back as he lifted the transmission. When he returned to the dealership, a fellow employee, Everitt Alleman, assisted him in physically lifting and removing the transmission from the van. Mr. Marshall asserts in his suit that soon after this incident, the "pop" he felt in his back manifested itself into a serious and sustained back injury.

Mr. Marshall did not mention his injury to Mr. Robin, nor did he inform Mr. Thompson or Mr. Alleman of the incident when he returned to the dealership. All

---

[1] Mr. Robin is the son of the owner of Ronald's Auto Repair Shop.

three men denied seeing Mr. Marshall exhibit any pain or discomfort at any time on the day of the incident.

When he returned to work the next Monday,[2] Mr. Thompson still did not mention the incident. Instead, he informed Mr. Thompson that he was suffering from the flu, and he took a sick day the next day. Because Wednesday was New Year's Day, he did not work again until Thursday, January 2, 2014. On that day, he reported the accident and injury to Mr. Thompson. The accident report generated from his report states that "[t]he incident was due to Herbert Marshall picking up on transmission & felt something pop in his back."

Mr. Thompson immediately sent Mr. Marshall to the emergency room of the Opelousas General Hospital, where he was examined by Kolleen Snyder, nurse practitioner; treated with injections and prescription medication; and released with instructions not to return to work until the next week.

The next day, Mr. Marshall went to the dealership's physical location, but not to return to work. Instead, without informing anyone at the dealership, he used his cellular telephone to take photographs of the transmission he had delivered.

Mr. Marshall did return to work the next Monday and continued working at the dealership until January 23, 2014. Seven days later, on January 31, 2013, Mr. Marshall filed a disputed claim for benefits with the Office of Workers' Compensation. In his claim, he sought wage benefits, medical treatment, penalties, and attorney fees.

At some point in January, Courvelle Toyota sought to obtain an appointment for Mr. Marshall with Dr. Gregory Gidman, a Lafayette, Louisiana orthopedic

---

[2] December 27, 2013 was a Friday.

2

surgeon.[3] Dr. Gidman's records reflect that he saw Mr. Marshall for the only time on February 3, 2014. Although Dr. Gidman wanted to see him again, Mr. Marshall chose not to return to him. Instead, he sought medical assistance from Dr. Joseph Bozzelle, a Lafayette, Louisiana pain management physician. On March 6, 2014, Dr. Bozzelle sought authorization from Risk Management Services LLC (Risk Management), Courvelle Toyota's workers' compensation administrator, to examine and treat Mr. Marshall. However, Risk Management approved the appointment for evaluation purposes only. The faxed approval from Risk Management clearly specified that even further office visits with Dr. Bozzelle required prior approval.

Pursuant to that authority, Dr. Bozzelle saw Mr. Marshall three times over the next two months: March 20, April 23, and May 29, 2014. The same day each examination was performed, Dr. Bozzelle compiled a written report of his examination, findings, and recommendations. Each of these reports were faxed to Risk Management within days of their completion. The third report indicated that Dr. Bozzelle intended to see Mr. Marshall in a month and also recommended that the patient not return to work pending further treatment.

Although Mr. Marshall did not return to Dr. Bozzelle, he did continue to seek medical treatment. The evidentiary record contains the June 8, 2014 records of the Opelousas General Emergency Room reflecting that he presented himself for treatment on that date; his request to the Office of Workers' Compensation seeking authorization to be treated by Dr. John B. Sledge, a Lafayette, Louisiana

---

[3] Mr. Marshall testified that his initial appointment was scheduled for January 15, 2014, but when he arrived for the appointment, the doctor would not see him because Courvelle Toyota had not provided the doctor with the proper authorization forms. However, other records in evidence suggest that this occurred on January 26, 2014.

orthopedic surgeon as his choice of physician; and Mr. Marshall's testimony that he sought evaluation and treatment through the Veterans Administration.[4]

The matter proceeded to trial on September 3, 2014, with the evidence consisting of the testimony of Mr. Marshall, Ronald Robin, Jr., Troy Thompson, Everett Alleman, and Shannon Melerine[5]; the pertinent medical records; and numerous other exhibits filed by both litigants. At the completion of the evidentiary phase of the trial, the WCJ took the matter under advisement. On October 29, 2014, the WCJ rendered oral reasons for judgment in open court rejecting Mr. Marshall's claims.

The trial court executed a judgment conforming to its oral reasons for judgment on November 10, 2014, and thereafter, Mr. Marshall perfected this appeal wherein he asserts three assignments of error:

1.  The Trial Court was manifestly wrong when it concluded that the plaintiff did not prove that he sustained an accident in the course and scope of his employment, thereby denying the appellant the workers' compensation benefits sought in this case.

2.  The Trial Court was manifestly wrong relying on preliminary urine drug screens while ignoring the fact that the confirmatory tests were negative.

3.  The Trial Court's flawed findings of fact were legal error which interdicted the fact-finding process and the *de novo*, rather than the manifest error, standard of appellant review should be applied to this case.

---

[4] The evidentiary record contains no evidence from the Veterans Administration to suggest what if any treatment he received.

[5] Ms. Melerine was an employee of Risk Management.

4

**OPINION**

The standard of review applied in workers' compensation cases is well settled:

> In a workers' compensation case, as in other cases, the appellate court's review of factual findings is governed by the manifest error or clearly wrong standard. *Smith v. Louisiana Department of Corrections*, 93-1305 (La.2/28/94), 633 So.2d 129, 132; *Kennedy v. Security Industrial Insurance Company*, 623 So.2d 174, 175 (La.App. 1st Cir.), *writ denied*, 629 So.2d 389 (La.1993). The two-part test for the appellate review of facts is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record establishes that the finding is not manifestly erroneous. *Mart v. Hill*; 505 So.2d 1120, 1127 (La.1987). An appellate court may not set aside a trial court's factual finding unless, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. *Stobart v. State, through Dept. of Transportation and Development*, 617 So.2d 880, 882 (La.1993). Furthermore, when factual findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone that bear so heavily on the listener's understanding and belief in what is said. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

*Harrison v. Baldwin Motors*, 03-2682, p. 3 (La.App. 1 Cir. 11/3/04), 889 So.2d 313, 315, *writ denied*, 05-249 (La. 4/1/05), 897 So.2d 609.

In order to receive workers' compensation benefits, an employee must prove, by a preponderance of the evidence, that he suffered a personal injury by an accident arising out of the course and scope of his employment. La.R.S. 23:1031(A). In *Bruno v. Harbert International Inc.*, 593 So.2d 357, 361 (La.1992) (first alteration ours), the supreme court stated:

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, 13 *Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends. Malone & Johnson, *supra*; *Nelson* [*v. Roadway Express, Inc.*, 588 So.2d 350

5

(La.1991)]. Corroboration may also be provided by medical evidence. *West*, *supra*.

In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987). The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. *Gonzales v. Babco Farms, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988) (collecting cases). Indeed, the manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court's decision is based solely upon written reports, records or depositions. *Virgil v. American Guarantee and Liability Insurance Co.*, 507 So.2d 825 (La.1987).

Attempting to give meaning to the nebulous terms "clearly wrong" and "manifest error," we recently enunciated the following general principles that govern an appellate court's power to reverse a trial court's factual findings:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. <u>Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story,</u> the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell v. Esco*, 549 So.2d 840, 844-45 (La.1989) (citations omitted and emphasis supplied).

As reflected by the underscored language above, in *Rosell*, *supra*, we identified two factors that limit the deference due the trier of fact. In *West*, *supra*, we identified a third factor especially apt in compensation actions: "the appellate court is not required by [the

6

manifest error/clearly wrong] principle to affirm the trier of fact's refusal to accept as credible uncontradicted testimony . . . where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles." *West*, 371 So.2d at 1150; *See Thomas v. RPM Corp.*, 449 So.2d 18, 21 (La.App. 1st Cir.), *writ denied*, 450 So.2d 965 (La.1984).

With these rules of law and interpretation in mind, we turn to an analysis of the evidence presented.

Mr. Marshall acknowledged that Mr. Thompson told him to use the lift-gate truck, but testified that before leaving the dealership, he attempted to test the lift-gate and found that it did not work properly. Therefore, he used the van instead. While suggesting that there was nothing wrong with the lift-gate truck, Mr. Thompson acknowledged that from time-to-time it would not initially function properly and there would be a delay of up to three minutes from the time it was initially engaged until it would begin to work properly. He asserted, however, that after the three-minute delay "it perks right up." Mr. Alleman made no mention of the three-minute delay and testified that he never had any problem making the lift-gate work. Mr. Thompson testified that he only became aware of Mr. Marshall's use of the van when Mr. Marshall returned to the dealership.

Dr. Gidman did not testify, but his medical records of February 3, 2014, were introduced into evidence. These records reflect that Mr. Marshall provided the doctor with a history of sustaining an injury to his back on December 27, 2013, while lifting a transmission. He reported to Dr. Gidman that he felt his back "pop" while lifting the transmission, that he began suffering from flu symptoms soon after the accident, and that his lower extremity symptoms became more noticeable after his flu symptoms resolved. Dr. Gidman's initial assessment was that Mr. Marshall had sustained a lumbar strain and was still suffering from low back pain. He summarized his findings in a February 6, 2014 report as follows:

7

This patient's neurologic examination is normal, although he has radicular symptoms. His plain x-rays were negative. The patient demonstrates 3/5 Waddell signs as positive, one of which is markedly inconsistent straight leg raising. Waddell's are screening maneuvers that may indicate evidence of psychological and/or psychosocial factors affecting subjective complaints. The patient was instructed in a home program to include soaks, rub-downs, heating pad, and proper sleeping position. He is to stop all medication during the day when working and take Extra Strength Tylenol for pain one every four hours as needed for pain. When not working, he was given a prescription for Tramadol 50 mg tablets one every four to six hours for pain. He is also instructed to take Acriptin or Ecotrin, which are coated aspirin, to take one tablet twice daily with breakfast and supper for anti-inflammatory effect. . . . He can resume regular activities at work in a light manner. It is okay for him to drive vehicles at work. He should not take the tramadol during the day and is just to take Extra Strength Tylenol as needed for pain, and I will recheck him in one week for a follow-up visit.

Dr. Bozzelle's records reflect that Mr. Marshall came to him on March 20, 2014, complaining of "[mid] back pain, lower back pain, hip pain, and pain, weakness, prickling sensations and numbness into his legs bilaterally." With regard to the history associated with these complaints, Dr. Bozzelle noted the following:

He was working in his normal course and scope of employment while lifting a transmission off of the floor. He felt a pop in his low back. Mr. Marshall stated it was at the end of the day and he was suffering with the flu so he went home to rest. His back continued to hurt for the next few days. At that time he was still suffering with the flu so he attributed his pain to flu related symptoms. Once he recovered from the flu he continued to have mid back pain and lower back pain radiating into his legs bilaterally with weakness in his lower extremities.

In examining Mr. Marshall's back, Dr. Bozzelle noted:

There is tenderness and muscular spasms noted over the entire thoracic spine. Point tenderness midline and paracentral to the right and left hand side over the mid and lower thoracic facets. There is pain in flexion and extension in the thoracic spine. There is pain with facet loading as well into full extension. There is pain and palpable muscle spasms noted as well in the lumbar spine. There is pain in the lumbar spine with facet loading in full extensions as well as pain when he moves into flexion. He has sacroiliac joint tenderness bilaterally, and palpable tenderness over the hips. He has positive

8

interrogation to FABER, Gaenslen's, and sacral compression bilaterally as well. No trochanteric bursal tenderness.

With regard to Mr. Marshall's lower extremities, Dr. Bozzelle stated:

> As noted above he has subjective tingling sensations and prickling sensations into his lower extremities bilaterally. Sensory deficits to the left posterior leg and into the lateral foot as well as to the anterolateral thighs and anterior knees bilaterally indicative of L4 and left S1 patterns. He has a weakness to the left S1 greater than the right and decreased reflexes bilaterally at the L4 levels, intact to the S1 with regard to the ankles. He does have pulling in his back with straight-leg raise as well bilaterally.

Dr. Bozzelle's impression was that Mr. Marshall (1) had suffered a work-related injury; (2) Lumbar pain, facet joint tenderness, and muscular spasms, suspect herniated disc; (3) Thoracic pain with facet joint tenderness and muscular spasms; (4) Lumbar radiculopathy; and (5) Bilateral SI joint pain and positive interrogation to Special's testing.

With regard to a treatment plan, Dr. Bozzelle initially recommended the following:

> We are seeing Mr. Marshall for the above injuries that he sustained on the job, on the above noted date. He seems to have a couple of issues going on with his mid and lower back as well as his SI joints and lower extremities. We will stay as conservative as possible for now and the see how he responds. I would like to get him some thoracic and lumbar spine x-rays as well as some plain films of his hips / SI joints. If his lumbar radicular complaints persist we will look at an EMG in the future. I would recommend an MRI of the lumbar spine in the future if he experiences some increased neurological deficits. I would like for him to be enrolled in passive therapy, twice per week for six weeks. We will see how he responds to this. He has medication from Dr. Gidman, so we will not prescribe any. We will see him back in one month for follow-up.

Dr. Bozzelle could not provide the treatment or obtain the test results he desired because of the "evaluation only" limitation placed on his authorization by Risk Management.

Mr. Marshall returned to Dr. Bozzelle on April 23, 2014. Because Dr. Bozzelle specializes in pain management, he had previously required Mr. Marshall to sign a narcotics agreement wherein he agreed, among other things, that he would refrain from using any illegal controlled dangerous substance during his treatment with Dr. Bozzelle; and that a violation of any terms of the narcotics agreement could result in Dr. Bozzelle terminating the existing doctor/patient relationship. At the March appointment, Mr. Marshall had signed an additional document wherein he agreed to submit to random blood or urine screening tests as a means of insuring his compliance with the agreement; and he provided a urine sample each time he saw the doctor.

Dr. Bozzelle's report, compiled from the information obtained at the April 23 examination, revealed that testing at an independent laboratory had revealed the presence of cocaine in the March urine sample; and that in-house sampling of the April 23 urine sample also tested positive for the presence of cocaine. However, with regard to the April 23 sample, later testing by the independent laboratory revealed that the in-house testing was inaccurate, and that the sample did not contain cocaine.

With regard to the examination performed on Mr. Marshall, Dr. Bozzelle found no change in his patient's complaints or physical condition from the month before. He stated in his report that "[he] still would like to get an MRI of his lumbar spine[,]" and that he would continue to attempt to obtain authorization from Risk Management. In addition to the need for an MRI, his recommended path of analysis and treatment continued to include x-rays of Mr. Marshall's thoracic and lumbar spine, his hips, and his SI joints; passive therapy, twice a week for six weeks; and urine and blood tests. Requests for authorization for the suggested

tests and treatment, including the lumbar spine MRI, were faxed to Risk Management on April 29 and May 5, 2014. Upon receipt of the second request, Risk Management approved the request for the x-rays, but denied the requests for passive therapy and the urine and blood tests. At that time, the reason stated for the denial was that this treatment and the tests were not in accordance with the medical treatment schedule. Risk Management did not respond to the request for a lumbar spine MRI.

Dr. Bozzelle saw Mr. Marshall the third and last time on May 29, 2014. Again, the in-house testing of the urine sample provided by Mr. Marshall revealed the presence of cocaine, but again the subsequent independent laboratory testing found that the in-house testing result was inaccurate as there was no cocaine found in the sample.

In his final written report, Dr. Bozzelle summarized the findings associated with the visit as follows:

> He continues with the above noted pain since he was involved in a work related injury on the above noted date. His pain is sharp, shocking, tingling, and prickling. It is intermittent in timing and made worse with lying, sitting, and standing. His pain is made better with pain medication. His pain is a 7/10 in severity as per the VAS. Note that he is using ice and heat therapy to deal with his pain. He has been taking oral lidocaine for tooth pain recently. He did show me a bottle of that. I would have to check for cross reactivity concerning that issue at this point. He did have x-rays done, which showed the SI joint with no bony abnormalities, no fractures, no sacral insufficiency fracture, no sacroiliitis. However, he can still have sacroiliac joint pain. He has cervical spondylosis with no fractures. He has C4-5 and C5-6 disc space narrowing and other than that, no acute fractures. Lumbar x-rays actually looked relatively normal with the exception of some sacralization on the right-hand side of the lower lumbar segment.

His report described his examination findings with regard to his lower back as follows:

> He has tenderness and muscular spasms noted over the entire thoracic spine. There is pain with flexion and extension. There is SI joint

11

tenderness bilaterally. He also has positive interrogation, FABER, Gaenslen, and sacral compression bilaterally. There is point tenderness midline and paracentrally in the lumbar spine. Spasms are palpable as well. He has limited mobility in all plans secondary to guarding, pain, and spastic tone.

The same report described the findings with regard to the lower extremities examination as follows:

He has some subjective tingling and prickling into the lower extremities. Sensory deficits to the left posterior leg and into the lateral foot as well as to the anterolateral thighs and anterior knees bilaterally indicative of L4 and left S1 patterns. He has weakness to the left S1 dermatome and myotome, greater on the right, decreased reflexes in the L4s bilaterally. His S1 ankle reflexes are intact. Straight leg raise is positive bilaterally.

The report noted that the x-rays authorized by Risk Management were "essentially unremarkable" but that the patient continued to have objective weakness in the lumbar area. Dr. Bozzelle reasserted his view that a lumbar spine MRI would be of assistance in treating his patient as would passive therapy. He noted that he intended to see his patient again in one month. His work status report at this time was that Mr. Marshall should not return to work until he received further treatment.

When Mr. Marshall presented himself to the emergency room of the Opelousas General Hospital at 3:11 p.m. on Sunday, June 8, 2014, he was initially evaluated by Geronna Leonards, a nurse practitioner.[6] His complaint was that he was suffering from both back spasms and a rash. He remained in the emergency room for approximately two hours, and the discharge diagnosis including a finding that Mr. Marshall suffered from a strain of his back and a suggestion that he obtain follow-up care from his primary physician.

Three days later, on June 11, 2014, Mr. Marshall filed a document with the Office of Workers' Compensation identifying Dr. Sledge as his choice of

_____

[6] The emergency room record lists the attending physician as Dr. Henry Kaufman, but it appears that he did not personally examine Mr. Marshall, and that his role was to review and approve the findings of the emergency room staff.

orthopedic surgeon and seeking authorization to be treated by the doctor. This request was denied. A little over one month later, on July 17, 2014, Dr. Bozzelle faxed another request to Risk Management for authorization for passive therapy, urine and blood drug tests, and a lumbar MRI. Risk Management denied authorization for these requests that same day. A fax sent to Risk Management four days later by Dr. Bozzelle seeking permission to have Mr. Marshall undergo follow-up treatment with him met the same fate. Mr. Marshall testified that, thereafter, he sought treatment through the Veterans Administration. However, the record contains no evidence of the medical treatment he received through that agency.

With regard to his medical treatment, Mr. Marshall testified that on January 2, 2014, he went to the emergency room of the Opelousas General Hospital at the instructions of his employer for treatment and a drug test. He acknowledged receiving the previously described treatment from the emergency room, as well as the fact that he provided a urine sample for testing to the emergency room personnel.

According to Mr. Marshall, Dr. Gidman wanted more testing to determine whether his injury was muscular or spinal related, but he did not return to Dr. Gidman because he considered the doctor to be Courvelle Toyota's doctor. He saw Dr. Bozzelle to obtain an independent evaluation. Mr. Marshall acknowledged that his employer initially paid for Dr. Bozzelle's services, but it refused to approve the testing the doctor deemed necessary. This refusal on the part of Courvelle Toyota to pay for his medical expenses was what brought him back to the emergency room on June 8, 2014.

At trial, Mr. Marshall testified that he still experienced low back pain and tingling down into his legs. He stated that he generally uses a cane while walking because it relieves the pressure on his back, but acknowledged that no physician recommended him using such a crutch. Additionally, he testified that his treatment through the Veterans Administration was in the form of a tens unit and a recommendation that he participate in physical therapy. He acknowledged working for Courvelle Toyota through January 23, 2014, but asserted that he was limited to light duty with a minimum of bending and lifting. Additionally, he acknowledged that he had worked for Agape Total Care, LLC (Agape) before he left Courvelle Toyota's employment and continued to work for Agape through February 25, 2014, caring for a terminally ill patient.[7] He described his activities in that employment as cooking for the patient in the morning, and returning in the evening to sit with the patient until bedtime. However, as his back pain increased in February, he had to stop even this light activity.

In addressing Dr. Bozzelle's urine test results, Mr. Marshall denied using cocaine and could only attribute the initial positive screen test to the fact that he was taking lidocaine at the time for an abscessed tooth. According to Mr. Marshall, he told Dr. Bozzelle that he was taking lidocaine, and he was well aware that Courvelle Toyota had a drug-testing policy for any employee who suffered a work-related accident.[8]

Connie Freese was the first claims adjuster to work Mr. Marshall's claim for Risk Management, and she was replaced by Shannon Melerine in late June or early

---

[7] Agape's payroll records introduced into evidence reflect that Mr. Marshall began working part-time for it in early December of 2013, and continued working until February 27, 2014.

[8] Mr. Marshall testified that he understood that to be the policy of all employers, not just Courvelle Toyota.

July 2014. Ms. Freese did not testify at trial, but a severely redacted copy of her notes was introduced into evidence by Courvelle Toyota.[9] Ms. Melerine did testify, based on her knowledge of the claim on her reading of an unredacted copy of Ms. Freese's notes, and most of that which she testified to as fact does not appear in the redacted copy introduced into evidence. According to Ms. Melerine, these notes established that medical treatment was authorized during the initial investigation process; the investigation was left to the office of Courvelle Toyota's trial counsel; that toward the end of May of 2014, Ms. Freese made the decision to deny the claim based partly on Mr. Marshall's failure to use the lift-gate truck and on his refusal to provide a second urine sample at the emergency room on January 2, 2014; and that the drug tests performed by Dr. Bozzelle played no part in the decision to deny the claim.[10]

The WCJ orally issued its reasons for judgment in open court on October 29, 2014. We find that in those reasons for judgment, the WCJ committed manifest error in reaching the ultimate factual conclusion that Mr. Marshall failed to meet his burden of proof that he sustained a compensable accident in the course and scope of his employment with Courvelle Toyota.

The evidentiary record undisputedly establishes that Mr. Marshall was in the course and scope of his employment with Courvelle Toyota on December 27, 2013, when he and Mr. Robin lifted a transmission weighing in excess of four hundred pounds into the back of the van. While the WCJ correctly concluded that Mr. Marshall failed to immediately report to his employer that he had experienced a "pop" in his back while lifting the transmission, and that that failure was in

---

[9] Counsel for Courvelle Toyota suggested in his questioning of Ms. Melerine that the redacted material in the copy of Ms. Freese's notes introduced into evidence represented nothing more than "Connie Freese's thought processes."

[10] None of these factual assertions are in the redacted copy of Ms. Freese's notes.

15

violation of Courvelle Toyota's employer/employee policy, that failure in and of itself does not preclude Mr. Marshall from receiving workers' compensation benefits. In *J.P. Morgan Chase v. Louis*, 44,309, p. 6 (La.App. 2 Cir. 5/13/09), 12 So.3d 440, 445, the court stated that "[l]ong delays may be excused when the claimant does not initially appreciate the severity of her injury." In this instance, Mr. Marshall reported his injury three business days after his injury occurred. Simply stated, it is not at all uncommon for an employee to initially ignore what appears to be a minor discomfort at the time to avoid appearing as a malingerer in the eyes of an employer. Discovery later that the minor event has manifested itself into a much more serious medical condition, does not preclude recovery of workers' compensation benefits. In this case, after recovering from the flu and realizing that his back discomfort was not associated with that event, Mr. Marshall reported the event to his supervisor at the first available moment. Additionally, even though Courvelle Toyota made much of Mr. Thompson's testimony that Mr. Marshall worked as normal through January 23, 2014, Ms. Freese's January 27, 2014 note reveals that Mr. Marshall's co-workers were aware that he was complaining of back pain.[11]

We next note that all of the medical evidence in the record supports a finding that Mr. Marshall provided all medical providers with a consistent history of having felt his back "pop" when he lifted the transmission at Ronald's Auto Repair. Additionally, every medical record in evidence supports a diagnosis of Mr. Marshall having sustained a back strain or sprain. Given the only history before each of these medical providers, it follows that the only conclusion supported by

---

[11] A January 27, 2014 entry in Ms. Freese's notes states that she received a telephone call from Angie with Courvelle Toyota that day informing her that Mr. Marshall was requesting to be seen by a doctor because of "pain/pressure in his low back and tingling into his legs when sits[,]" and that "the people [Mr. Marshall] works with were aware that he was continuing to complain of back pain" although this was the first time he asked to see a doctor.

16

the evidence is that Mr. Marshall sustained this injury while lifting the transmission.

> A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

*Lucas v. Ins. Co. of N. Am.*, 342 So.2d 591, 596 (La.1977).

In fact, Risk Management's reasons for denying Mr. Marshall benefits was not that he did not sustain an accident, but that he failed to use the lift-gate truck, and that he refused to provide a second urine sample to the emergency room on January 2, 2014.[12]

With regard to this first reason, we note that whether Mr. Marshall should have used the lift-gate truck instead of the van is not a valid defense to his workers' compensation claim. The failure to use an adequate guard or protection was repealed as a La.R.S. 23:1081 defense to a workers' compensation claim by 2001 La. Acts No. 1014, § 1, and counsel for Courvelle Toyota acknowledged this at trial by arguing that Mr. Marshall's use of the van should be used in judging his credibility on other issues as opposed to his fault in causing his own injury. Specifically, Courvelle Toyota asserted that Mr. Marshall's testimony concerning why he used the van instead of the lift-gate truck lacks credibility.

In support of this argument, Courvelle Toyota points to the testimony of Mr. Thompson and Mr. Alleman. However, we do not find that argument supported by their testimony. In fact, Mr. Thompson's testimony actually supports Mr. Marshall's testimony when he acknowledged that sometimes there is a delay of up

---

[12] Ms. Melerine testified that these reasons were expressed in that portion of Ms. Freese's notes not introduced into evidence.

to three minutes before the lift-gate will begin to work. Mr. Alleman was not asked about the idiosyncrasies of the lift-gate, but merely whether it worked. Nothing in the evidentiary record suggests that Mr. Marshall had knowledge of this particular quirk associated with the operation of the lift-gate.[13] Thus, while his failure to use the lift-gate truck may be relevant to whether Mr. Marshall's testimony is credible, we find that it does not support a finding of lack of credibility in this instance.

Risk Management's denial of benefits because Mr. Marshall refused to provide a second urine sample to the emergency room personnel on January 2, 2014, is also not supported by the evidentiary record. While Mr. Marshall's testimony that he did provide a urine sample appears to be supported by the emergency room records,[14] nothing in those records suggest that the sample was for drug testing purposes or that another sample was requested of Mr. Marshall.

The WCJ's oral reasons for judgment emphasize Dr. Gidman's finding that some of his test results suggested the possibility of "psychosocial factors affecting subjective complaints[,]" but did not consider the fact that Dr. Gidman's ultimate diagnosis was that of lumbar strain, or the fact that Dr. Gidman concluded that a follow-up evaluation was required. The WCJ also placed much emphasis on Dr. Bozzelle's concern with the laboratory finding that Mr. Marshall's first urine sample tested positive for cocaine, and failed to consider that the next two samples

---

[13] In fact, counsel for Courvelle Toyota gave further credibility to Mr. Marshall's problems with the liftgate when he attempted to interpose his findings resulting from his personal investigation into Mr. Marshall's cross-examination. After stating to Mr. Marshall that he had seen the liftgate truck, and he knew that it worked, he asked Mr. Marshall whether he was aware that "the buttons to actually activate the lift is very sensitive[,]" and that if one does not "hit the exact spot, that lift doesn't work?"

[14] A notation under the **Nursing Assessment** section of the emergency room record states that Mr. Marshall was "[a]ble to urinate without dysuria. No complaints of frequency or urgency."

were ultimately found to be negative for cocaine. While we recognize that the initial sample tested positive for cocaine in both the in-house testing and the scientific laboratory testing, we must also consider the entire record with regard to this issue. Mr. Marshall denied using cocaine and explained to Dr. Bozzelle that he had been taking oral Lidocaine for tooth pain. When shown the Lidocaine bottle, Dr. Bozzelle concluded that before accusing Mr. Marshall further, he should "check for cross reactivity concerning that issue[.]" Nothing in the record suggests that Dr. Bozzelle or any other doctor followed up on this issue, and Dr. Bozzelle continued to attempt to treat Mr. Marshall.

The WCJ also found significant the statement in the June 8, 2014 emergency room record that Mr. Marshall "[a]ppears to be doctor shopping." We have reviewed the medical record at issue as well as the full evidentiary record before us and find no support for this rather gratuitous comment by the nurse practitioner. In fact, when released by Opelousas General that very day, the same nurse practitioner diagnosed Mr. Marshall as suffering from a "[s]train of back." Considering the fact that at this time Courvelle Toyota had refused all medical treatment requested by Dr. Bozzelle despite his objective findings and Mr. Marshall's complaints of increased back pain, it should not be surprising that he would try to find another doctor to treat him and that, just three days later, he made his request to be treated by Dr. Sledge.

We also find manifest error in the WCJ's reliance on Mr. Marshall's actions on January 3, 2014, in taking pictures of the transmission and recording a video of him attempting to work the truck's lift-gate to discredit his testimony. Considering today's environment where the majority of people own smart phones and use them to document the world around them, it would be more surprising if Mr. Marshall

19

had not taken photographs of the object which caused him injury. He explained that he took the video because his supervisors rejected his story that the lift-gate had failed to work on December 27, 2013. He testified that they had another employee attempt to activate the lift-gate and he filmed their five to ten minute effort to get it to work. While the video was not available for trial, Courvelle Toyota's counsel acknowledged in his questioning of Mr. Marshall that he had seen the video, and he acknowledged that the lift-gate did not immediately work although he suggested that the delay was "less than a minute."

Finally, the WCJ criticized Mr. Marshall's use of a cane without having been told by a doctor to do so. However, it must be noted that other than the treatment offered to Mr. Marshall by Dr. Gidman on February 2, 2014, Courvelle Toyota has refused all requests for treatment of his back condition, including passive therapy and any follow-up treatment with Dr. Bozzelle. Moreover, the extent of Mr. Marshall's injury is unknown as Courvelle Toyota never approved Dr. Bozzelle's request for a lumbar MRI. Mr. Marshall explained that he used the cane, because it took pressure off his back. To use the fact that he sometimes walks with a cane against him is ironic since it was Courvelle Toyota's actions that prevented him from receiving medical treatment.

After reviewing the record in its entirety, we find that the WCJ was manifestly erroneous in finding that Mr. Marshall failed to prove that he suffered a work-related accident; that there was no sound reason for rejecting Mr. Marshall's testimony as credible; and that the WCJ's finding that Mr. Marshall failed to prove that he suffered a work-related injury was reached by overlooking applicable legal principles. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979).

20

Having found manifest error and having conducted a de novo review of the record, we find that Mr. Marshall proved by a preponderance of the evidence that he suffered a lower-back injury from an accident occurring on December 27, 2013, while he was within the course and scope of employment with Courvelle Toyota. Based on the record before us, we find that Mr. Marshall is entitled to supplemental earnings benefits from January 24, 2014 through February 25, 2014, in the amount of $897.35 per month based on an offset for the wages he earned from Agape.[15] La.R.S. 23:1221(3). We further find that he is temporarily and totally disabled from February 26, 2014, forward and that he is entitled to weekly indemnity benefits of $248.05, as stipulated to at the trial on the merits. La.R.S. 23:1221(1).

Turning to the question of penalties and attorney fees, we find that the record is devoid of any evidence showing that Courvelle Toyota and/or Risk Management made any effort to reasonably controvert this claim, other than by sending Mr. Marshall to Dr. Gidman on January 2, 2014. "An employer must adequately investigate a workers' compensation claim. The crucial inquiry is whether the employer has articulable and objective reason for denying or discontinuing benefits at the time it took that action." *Craig v. Bantek W., Inc.*, 04-229, p. 7 (La.App. 1 Cir. 9/17/04), 885 So.2d 1241, 1246.

Ms. Melerine testified that Ms. Freese's notes revealed that Risk Management's initial position in this matter was to pay no benefits and authorize only medical treatment for Mr. Marshall during the initial investigative process. The investigation, according to Ms. Melerine's interpretation of Ms. Freese's notes,

---

[15] Average Weekly Wage = 372.08 X 52 ÷ 12 = 1612.35; Earnings at AGAPE = 330.00 every two weeks; Average Weekly Wage 165.00 X 52 ÷ 12 = 715.00; Supplemental Earnings Benefits 1612.35 – 715.00 = 897.35.

was to be performed by the office of Courvelle Toyota's legal counsel, and not by Risk Management.[16] However, nothing in the record establishes what that investigation entailed. Still, the investigative process continued until late May of 2014, when Ms. Freese made the decision to deny Mr. Marshall's claim based only on his failure to use the lift-gate truck as instructed and his refusal to provide a second urine sample to the emergency room on January 2, 2014. As previously stated, the first reason has no basis in law, and the second has no basis in fact.

We also find no evidentiary support for Ms. Melerine's statement that Courvelle Toyota provided medical treatment to Mr. Marshall during the investigative phase. Initially, Risk Management would only approve Mr. Marshall's examination by Dr. Bozzelle. When the doctor's examination revealed objective findings of spasms over the entire thoracic spine as well as in the lumbar spine; and when he requested authorization for testing and treatment this was rejected by Risk Management. Except for a minor concession relative to the taking of x-rays after the second examination by Dr. Bozzelle, where he continued to make objective findings with regard to his patient, Risk Management continued to refuse treatment or other meaningful testing. These continued refusals, according to Ms. Melerine, was because of Ms. Freese's conclusion that Mr. Marshall's claim was not compensable based on the two reasons previously noted.

For the foregoing reasons, we award penalties of $2,000.00 based on Courvelle's failure to pay indemnity benefits; $2,000.00 based on its failure to authorize the medical treatment recommended by Dr. Bozzelle; $2,000.00 based on its failure to authorize follow-up care and treatment by Dr. Bozzelle; and $2,000.00 based on its failure to consent to Mr. Marshall's request to select Dr. Sledge as his

---

[16] In a rhetorical question addressed to Ms. Melerine during her testimony, Courvelle Toyota's counsel noted that "[t]he "majority of [the] investigation was handled by my office?"

treating orthopedic surgeon. La.R.S. 23:1201. We further award Mr. Marshall attorney fees in the amount of $11,385.17, as evidenced by his counsel's statement and an additional $5,000.00 for work performed by his counsel on appeal.

## DISPOSITION

Based on the foregoing, we reverse the judgment of the workers' compensation judge finding that Mr. Marshall failed to prove that he suffered a work-related accident. We render judgment finding that Mr. Marshall proved that he suffered a work-related accident and that he is entitled to supplemental earnings benefits in the amount of $897.35 per month for the period from January 24, 2014, through February 25, 2014. We further render judgment awarding Mr. Marshall temporary total disability benefits in the amount of $248.05 per week from February 26, 2014, and onwards. We further render judgment awarding Mr. Marshall a total of $8,000.00 in penalties and $16,385.17 in attorney fees. We assess all costs of this litigation at the trial level and on appeal to Courvelle Toyota.

**REVERSED AND RENDERED.**